The Honorable Judges of the United States Court of Appeals in the United States Judicial Circuit. Hear ye, hear ye, hear ye. All persons having business before this Honorable Court are admonished to draw near and give their attention as the Court is now sitting. God save the United States and this Honorable Court. Well, good morning, ladies and gentlemen. I did want to make an announcement for the Council before us right now and following Council that we're going to adhere strictly to the times allotted for your oral argument. We've got a scheduling situation that requires us to be finished at a certain time, so we're going to adhere strictly to those times. With that, Mr. Hurst, you may proceed, or Ms. Hurst, you may proceed. Good morning, I'm Leslie Hurst, Counsel for Plaintiffs and Appellants, and can you hear me okay? Yes, we can. Okay, thank you. I'm going to talk first about merits issues, which apply to all defendants, and then second about some jurisdiction issues, which apply only to some plaintiffs and defendants, unless the Court directs me otherwise. On the merits, the core question of fact in this case is how a reasonable consumer perceived the 100% grated cheese Parmesan cheese labeling. The District Court decided this question of fact as a matter of law, but a question of fact should be resolved on the pleadings only at the outer boundaries. You resolve fact questions on the pleadings only at the point where a jury can resolve the question of fact in only one way, and given plaintiffs' allegations in this case, this is not an outer boundaries matter of law resolved on the pleadings case. For instance, plaintiffs allege, and the allegations must be taken as true at this stage, that in survey responses, the vast majority of purchasers of these products, when surveyed, reported that 85 to 95% of them reported that they read the labeling 100% Parmesan cheese to mean that the products were entirely cheese. We also allege, went to linguists, and linguists reported that the 100% representation most the products are entirely graded, as the District Court believed. Is it correct, Ms. Hurst, that the First Circuit panel in the, I believe it was the Dumont case on hazelnut creme coffee read the 100% Arabica coffee phrase basically the same way? Yes, and that was the dissent in that case. In that case... But the majority agreed. Majority agreed, yes. That was a reasonable way to read it. Yes, they did agree. So when here, the front label promise is objectively false and contradicted by small print on the back. Defendants aren't selling 100% cheese, they're selling cheese clumped up with wood pulp, fungicide, and cornstarch. Counselor, can you tell me what the reason is to have ingredients listed on the can? Well, the ingredients are required by FDA so that consumers can know what ingredients are. That's why they're there and to make sure the ingredients are accurate. Here actually, we allege in addition that the ingredients list contradicts the front the front of the can, let's say that we disagree with you that it's deceptive, if the front of the can is ambiguous, then it's permissible in full context to consider the ingredients list, right? No, that's not true at all. That is not true at all. That was one of the... That is the fundamental error of the district court. That is not the law in any state. The law in every state, which the court is obligated to follow in a diversity action, is that if the front label is deceptive, even if it could be, even if it has multiple meanings, even if it has implied representations, if the front label is deceptive to a significant number of consumers, then you do not dismiss on the pleadings a case when the back label contradicts the front label representations. So the district court was fundamentally wrong that there are some ambiguity rule, and if the front label doesn't deceive 100% of people, somehow you get to look at the back label. No state follows that law. Who makes the determination what the consumer thinks about whether it's deceptive or not? But pardon me, your honor, can you repeat that? Who makes the determination that the consumer feels it's deceptive? The jury makes that determination based on evidence. That's not something that should be resolved in the pleadings, especially in this case, where we have alleged that based on a survey, and surveys are generally one of the best indicators, best evidence of what consumers believe. And here, the vast majority of consumers... Like an election. Yeah, like an election, yeah. Counselor, I have a question for you. What about the fact that the piece of context about this being cheese that's kept at room temperature on a shelf, and that makes it different than the 100% Arabica coffee case, right? Yes. I mean, here, reasonable consumers understand that dairy products will spoil unless there's something in them to prevent that from happening. Yeah, so basically, the court said, regardless of this front-back dichotomy, that no reasonable consumer could believe it just defies common sense, because dairy products, they mold, they grow fuzz if you don't refrigerate them. Well, it turns out that's not true. And plaintiffs allege, citing two crass documents, that in fact, cured Parmesan cheese is so dehydrated, it doesn't need to be refrigerated. Well, I thought that it made it last longer, but not indefinitely. Crass documents say you don't need to refrigerate or have anti-caking agents in cured Parmesan cheese, because it lasts almost indefinitely without them. I don't think the almost indefinitely changes it here. I think consumers think a product is going to last for a reasonable time, so they can consume it almost indefinitely. Does it last 1,000 years? I don't know. But 1,000 years is not the time frame that we're looking at in this case. I do think that some consumers, I mean, we don't use, in my house, the green can. We use fresh-grated Parmesan cheese, but that Parmesan cheese, we keep in the refrigerator. I assume it's not as high quality as the kind of cheese that would be cured well enough to last at room temperature for the foreseeable future. Do you think reasonable consumers would expect that there was some very high grade of cheese, or assume that all cheese, all Parmesan cheese, was capable of staying at room temperature? I think that's a very narrow class of this cheese, right? No. Well, first of all, I don't know. I think you're raising a question of fact that needs to be resolved based on evidence. I don't know if reasonable consumers, a vast majority of them, think that cheese has to be refrigerated. It doesn't. It doesn't have to be refrigerated. Cheese is a lot older than refrigeration in the modern world, right? Yes. It's been a way to keep milk available for millennia, right? Without modern refrigeration. Yes. And you can buy grated Parmesan cheese that does not have additives, that does not have fungicide, that does not have wood pulp filler. It's not refrigerated. You can go to farmer's markets and buy it. And so I don't think you're necessarily correct about that assumption, that consumers all think that grated Parmesan cheese has to be refrigerated. Nor does that lead necessarily to the second step, which just because they refrigerate the cheese means that they think that if they don't refrigerate it, it must have additives in it. And that's what the district court thought. But that's a question of fact. You need to go, you need to collect evidence. What do consumers believe? And let it be decided on the merits. Ms. Hurst, could I ask you about the preemption issues, which the district court did not reach but the defendants have raised in their briefs. Is it correct that your focus here is really on the 100% claim on the front label? Yes, that's correct. And do you think the removal of 100% would cure the problem? Yes. Yes. Because that is a, that's, that is, that makes a difference. Now, defendants have said that 100% makes no difference at all. Well, yes, it does. That is, they acknowledge that consumers believe grated cheese is pure. They support that assumption. They support that belief by adding the 100% on there. But it doesn't matter. Yes, it matters. But we're not talking about 100% pure Parmesan cheese. We're talking about 100% grated Parmesan cheese and the standard of identity says that it's permissible to call it Parmesan cheese even if it has these additives in it. So why wouldn't that preempt? It's still 100% Parmesan cheese taking into account the standard of identity. I don't think this case is about the standard of identity. Preemption applies only if state law imposes some requirements in addition to federal law. State and federal law both prohibit deceptive advertising. And there is, the FDA has never indicated, never ruled, never specifically authorized that this labeling is not deceptive. They have, you can sell grated cheese, but if you're going to label it and call it 100% grated cheese, we've alleged that's deceptive. A survey shows that's deceptive. Linguists who've looked at the phrase say that is deceptive because it tells consumers it's pure cheese. Not, I mean, the 100% doesn't modify grated. That would be very impossible. Everyone knows grated cheese. The cans look different. I mean, in some of the cans, 100% grated is together and small, and then Parmesan cheese is big. And in others, you know, it looks more like grated Parmesan cheese is a unit. The canisters are not uniform in that respect. No, they're not. But I think they all convey the message that the product you're buying is entirely cheese without additives. And there's other things on the labels, too, that I think are important. They show chunks. Some of them show chunks of cheese, you know, as if this is what you're getting. You're getting a chunk of cheese, it's grated. One of Kraft's even says 100% cheese, no fillers. So there's, no label is identical, but they all indicate you're buying cheese. You're buying entirely cheese. Council, don't you have to look at the label in context, which includes not only the front, but also the ingredients list? Ultimately, when you get to it, well, yes, you have to look at it in context. Your linguist didn't do that, did they? The linguist looked at the phrase to see what looking at that phrase would mean. But they didn't put it in context, though, of the label, the entire label. They did not look at the entire context of every fact that a consumer might consider when interpreting that phrase. That's true, and that's because that is the role for the jury when we get there. What facts shape the consumer's perception beyond just the words? We'll get to that. We'll get to that, and that's where the parties debate what's important. Defendants, for instance, say, well, consumers interpret this phrase by looking to the standards of identity. Well, I think that's not very likely. They say consumers interpret this phrase by referencing cheese that you buy in a farmer's market, and they know that our cheese has additives, whereas farmer's market cheese or that you buy from retailers doesn't. Well, I think that supports our claim. A reasonable consumer goes out. They buy cheese from various places. It doesn't have additives. They go into the store. They see this product sitting there. It says 100% cheese. It's quite reasonable to think, well, it doesn't have additives. It's pure cheese, just like I bought when I buy it from Albertson's for when the retailer grates it. So, yes, Your Honor, the entire context is going to be important and needs to be looked at. But on the pleadings, on the pleadings, we get to present evidence when the advertiser makes a prominent representation on the front and exclaims it on the back. Is it correct, Ms. Hurst, that, for example, in trademark law or trade dress law, we look at reasonable consumers and buyers in the whole context, right? And part of the context is retail buying of relatively low-priced items where we don't expect consumers to be paying very, very close attention. Because the way we would expect the Air Force to pay very close attention to the specs for a new multibillion-dollar fighter airplane, right? That's absolutely true. And you all have offered some support for the notion that a lot of consumers will make these kinds of choices in a matter of a few seconds. Is that right? That's correct. And that's part of the relevant context here. Absolutely. How do consumers buy this product? They're walking down the aisle way. They're going to buy this in addition to many other products. And when advertisers know this, I mean, the advertisers are sophisticated. They have market research. They know how consumers buy things. They know how much they get with the label. You haven't yet seen the defendant's market research for the tests of these different labels for with and without 100%, have you? We have not. We are, you know, at the pleading stage. Looking forward to seeing that research if you can get it. Yes, we are also. What relevance does the price point have in terms of context? I mean, fresh Parmesan cheese is more expensive, which is why a lot of people buy the green canister. Do you think people who pay a low price for cheese would expect purity? Well, I don't know. I mean, that's a relative term to people that buy this, think it's a low price for cheese compared to other cheese. I think the price context comes in more in if you compare what consumers do when they buy a relatively low value product, whether they're paying three dollars for cheese or five dollars as compared to, for instance, buying a house, buying a car, taking a loan out. In those contexts, what a reasonable consumer would look at and be able to trust without reading the prolecs carefully. That's where the price point, I think, is relevant. But when you're buying consumer products of relatively low value, whether you're paying three dollars or five dollars and you're it's part of it, you're busy day in the in the in the shopping market. No, consumers don't necessarily spend a lot of time on it. And the point is, the law doesn't require them to. As Judge Hamilton pointed out, the law does not require them to. And at this stage, we still have to prove our case. But at this stage, we get beyond the pleadings show what reasonable consumers actually do, because that's how a reasonable consumer is defined by what they actually do in the real world. Counsel, can I ask you a question about original jurisdiction and publics? Why were you unable to identify any individual named class member who had at least minimal diversity with publics? You did it for the others. And what jurisdictional discovery would you hope to get from publics that would show that? Well, we did we didn't identify. We're at the pleading stage and there's a discovery stay on if the court feels we need to identify an individual. I mean, let's let's assume the court thinks you need to identify. We can we can easily do that. Publix has, for instance, they have a loyalty program called Publix, where they they track people in that program and the products they buy. So through that discovery, we can easily get the names of individuals in the multiple states where they sell. But we just haven't had a chance to get that yet. That's something we have to get through discovery. It's not it's not, you know, publicly available on the Internet. Who buys what at Publix? But they have the information. I think I'd like to. You're down to seven minutes and about 15 seconds. Yes, I'd like to say the rest of my time for rebuttal, if I may. Sure. Yes, thank you. Mr. Brody. Good morning, everyone. Michael Brody for the Kraft Heinz Company. I will address the merits issues on behalf of all defendants. Mr. Collins will then address the timeliness of the appeal issue on behalf of certain defendants. And may it please the court. This case is about the labeling of a product, not the labeling of an ingredient. Grated Parmesan cheese. And I use those three words. Grated Parmesan cheese is a product. It's made of separate ingredients that are combined in a process that takes place in a factory. Just as frozen yogurt is different than yogurt and corn flakes are different than corn, grated Parmesan cheese is a different product than Parmesan cheese. And there are multiple cheese products from a block of cheese that you might see in the gourmet section of the grocery store to sliced cheese, shredded cheese, crumbled cheese and grated cheese. They all have different labels, different ingredients, and consumers view them differently depending on the product, the entire label and other points of context. It's not accurate to treat grated Parmesan cheese as interchangeable with cheese, which is what the plaintiffs asked this court to do. When Kraft and the other defendants sell grated Parmesan cheese, what are they selling? Well, the FDA has defined grated Parmesan cheese in its standard of identity, and it indicates that grated Parmesan cheese can have anti-caking agents and can have preservatives and still be grated cheese. So when defendants called their product 100 percent grated Parmesan cheese, what they were saying was exactly right. You did not need an asterisk to look at the back. Mr. Brody, what happens? This, I got to say, sounds a little bit Orwellian. But what happens if somebody, we've got a lot of ingenious food engineers in this country and around the world. What if somebody comes up with a way to, or maybe Kraft comes up with a way to manufacture grated Parmesan cheese that does not require the addition of cellulose or sawdust or antimicotics and so on? And how can they distinguish that product from the current products, other than by saying 100 percent? Well, they would distinguish it in the ingredient label, Your Honor. First, the standard of identity. Well, hardly anybody's going to read the ingredient label. They're trying to distinguish on the front label. Well, I guess I can't speak to what kind of advertisements would be permissible for a different kind of product. You know, they may put on the front label, you know, compare our label to Kraft. Ours is better. You know, I can't speak to that, Your Honor. But I do know the FDA has defined the product that we sell to include the things that we have in it. Now, regardless of how the, but the FDA, you would agree, has not approved the 100 percent label, part of the label, has it? Well, I would disagree with that, Your Honor. As to Kraft, in statements in the Federal Register that we quote in connection with the preemption and safe harbor arguments, the FDA published a statement saying that the product will be called 100 percent grated Parmesan cheese. Was that in the experiment with the shorter curing period? It is, Your Honor. So that wasn't really focused on the 100 percent, was it?  When the FDA made that determination. Is that like something that we ought to explore factually? No, not at all. As it relates to the issue of the safe harbor and preemption, it's not a factual issue at all. The FDA has said the product will bear the name 100 percent grated Parmesan cheese. I don't think we need to delve into why the FDA made that determination. I don't think so. Okay. To the issue, Mr. Brody, about the question I asked Ms. Hurst, it really has to do with the district judge's approach to consumer perceptions. In trademark and trade dress law, for example, that are somewhat more familiar to federal courts, especially with consumer products, we don't assume that information when they're looking at two confusingly similar labels next to each other. And we recognize that consumers make fast decisions. We protect them and competitors from initial confusion and from deliberate attempts to take advantage of limited attention and to use ambiguity. I have trouble understanding why we shouldn't take a very similar approach or at least permit a similar approach under state consumer protection laws, rather than assume that consumers are going to approach these labels with the care that a federal judge approaches in, let's say, interpreting a new statute. There are a lot of things, I guess, I'd like to say about that, Your Honor. First, one doesn't need to closely scrutinize anything here in order to determine exactly what's in the product. You know, here's the can of cheese. You look at the front, you turn the label. It's a quarter turn of the can. So it doesn't require scrutiny. Second, common sense tells us that a plastic canister of grated cheese sold in the aisle with the dried pasta and the tomato sauce is different than the cheese that's sold in the other side of the store that's kept under refrigeration. And that principle has motivated all the cases that address context. The Chen versus Dunkin' Donuts case, which is the case about what it means to be steak. Dunkin' Donuts called their product steak, even though it was a ground meat product with additives. The First Circuit, I think it was the First or Second Circuit, said no problem because in the context, consumers know that that patty on the Dunkin' Donuts sandwich is different than what you were to get at a fancy steak restaurant. And a last point about this before I get to the law, I guess, is the plaintiffs in this case have alleged they read the label. Ms. Hirst talked about this issue about whether there's too much cellulose in the product or not. And that's an issue that Judge Feinerman has not resolved. And if we have to get to that, we'll get to that. But in their allegations about that claim, these same plaintiffs allege that they looked at the package, read the ingredient list, and were deceived by the statement that when the defendant said cellulose was added to prevent caking, when, in fact, they now claim it was included for a different purpose. So these very plaintiffs have said, notwithstanding the short timeframe that's involved in this purchase decision, that they read the label. So I think that's the argument about that. But let me address the law. The plaintiff's argument here is that the trial court decided a fact question. I disagree completely. First, the plaintiffs don't focus on even the entire front of the label. They focus on the 100 percent cheese words, taking two words out of four. But what the trial court said here is, in the context of the product, context provided both by the entire label, which the law permits consideration of, and the context in which people buy the product, the store experience, there was no ambiguity. The only way you create an ambiguity is to ignore the entire context. And the states whose laws are at issue here have directed courts to consider that context, to look at the totality of the circumstance. Am I am you're saying that there's nothing ambiguous about the label? There's nothing ambiguous about the entire label. That's my first position. But my second position is Kraft and the other defendants consider, contend there's nothing ambiguous about saying 100 percent grated Parmesan cheese, because grated Parmesan cheese is a thing. And this canister contains nothing but what the FDA tells us is grated Parmesan cheese. Was that the district judge's rationale? No. The district judge said if we accept this idea that the statement on the canister, the four words, 100 percent grated Parmesan cheese, is ambiguous, then he said we look to the entire label. And the context provided by the entire label is the crucial question, to use his words, in his view, and this is the view we defend here on appeal. The entire label cannot be read to say there's nothing in this product other than Parmesan cheese, whatever that is, because we know that the label says clearly it contains cellulose to prevent aging and potassium sorbate. But Mr. Brody, you wouldn't deny that at least one reading of that label is that it's 100 percent Parmesan cheese and nothing else. And your friend on the other side contends that if there's just one possible misleading reading, then that's kind of game over. Well, the position is, the plaintiff's position is there's only one, there's an ambiguous reading of 100 percent grated Parmesan cheese. And we argue to the contrary, but accepting that position for the sake of argument, Your Honor, where does that get us? That puts us in the cases that we cite. You know, the Becerra case talked about diet soda, and the plaintiff supported their allegation with customer surveys that said diet means it'll help you lose weight. The court said, no, look at the entire label wrong. Workman versus Plum, another good example. The front label described all four food groups. The plaintiff said that's misleading because they're not present in the quantities that that would suggest. The court said no. Distinguishing plaintiff's cases, no, there was no affirmative misrepresentation. All those products are present, and the ambiguity is resolved by the entire label. The Chen versus Dunkin Donuts case is another example. The cases the plaintiff relies on are cases in which the accused statement, in this case, the two words they pick off the front label, would be clearly misleading. In the Beardsall case, this court referred to the Gerber case as dealing with clearly misleading statements. The district court said it's one in which the misleading interpretation is an unavoidable interpretation. And why isn't the standard simply a significant proportion of reasonable consumers will be misled? But the question I think, Judge Hamilton, is misled by what? Misled by the label that your clients have carefully studied, designed, and marketed. Well, the district court found that when the entire label is read, not just the two words, but the entire label, that it's not misleading. And it would be unreasonable for a consumer to look at a product that says it contains cellulose. So what would happen if a survey of consumers shows that, say, 50% of consumers read the labels the way plaintiffs do? Would we say those 50% are unreasonable and that there's no problem? Well, I think we'd have a big Daubert fight about that survey, Judge. I don't want to fight the hypothetical. It's a little premature for a Daubert fight here, right? And the understanding of the language on this label, I've got to say, from whether they're And it seemed to make sense to the First Circuit judges who wrote the DuMont opinions with similar sorts of language. Well, the DuMont case, I think, is a really interesting case, Judge. There, the product was advertised on the front as hazelnut cream coffee. It had no hazelnuts in it. That was clearly misleading. It was an unavoidable, misleading interpretation that a product called hazelnut coffee had hazelnuts in it. The Suchanuck case that this court... Oh, Judge Lynch thought it was not deceptive at all. There were, in essence, factual disagreements, as the majority wrote there, saying let the jury figure out how these labels are actually understood. We're talking about products that sell in huge volumes across a gigantic nation. The stakes for designing those labels are huge. And companies like Kraft and Heinz don't shoot from the hip on that. They study them carefully, right? And Your Honor, the law endorses that by permitting companies like the defendants in this case to defend their products based on the entirety of their statements. The Bober case from this court, the Davis versus G.N. case, the Freeman case, all cases deal with ambiguity of a statement. And the court finds that in light of the entire representation, the one statement taken out of context is not ambiguous in context. And therefore, it dismisses a matter of law. So, if we have the 50 percent of consumers, you'd say all the federal judges and state court judges around the country ought to say those 50 percent of consumers are unreasonable and are fair game. No, I'm not sure I would say that, Your Honor. If the survey said that the consumers read the front label and read the back label and based on the entire context were confused, that might be a different situation. I'm trying to focus on what's going here. And also, Your Honor, it's hard to say that this case fits into like the Dumont case where counsel, the survey in this case, they only looked at the front label, right? We have no idea. There's a one paragraph allegation that refers to what the survey says. We don't know what the survey said. I suspect if you ask most Americans in what was in cheese, they wouldn't get very close to that one either. But here, we know that what Kraft described the product as is not affirmatively misleading or clearly misleading because the FDA has defined what this product is. And I guess in the few minutes I've left, I'd like to segue to those issues. The FDA has said, grated Parmesan cheese, the thing that we sell, the thing that all the defendants sell here. Counsel, let me interrupt you a minute. Mr. Kong is going to have five minutes and you're down to 428 now. I think I started at 20 here, Your Honor. So that's right. Okay. Good. I'm glad. So is Mr. Collins. Both on the safe harbor and the preemption, I think there are solid defenses that the district court didn't have to reach here. The Federal Register advised that this product will bear the name 100% grated Parmesan cheese. The standard of identity describes this product as grated Parmesan cheese. The Moore case, the Moore versus Trader Joe's case, the case about the Manuka honey, is a situation where the FDA standard talked about what honey is. And Trader Joe's sold a product as 100% Manuka honey, even though there was honey in it derived from things other than Manuka flowers. The court found the claim preempted. It said it is 100% Manuka honey, even if Manuka honey has something in it other than Manuka flowers. The same is true here. This is if 100% means anything to change the meaning of this product, and we dispute that. But if it does, what Kraft sold here was 100% grated Parmesan cheese. So, the claim is preempted by the power of the Nutrition Labeling Education Act, and I refer to the Moore case. It's also not a violation of state law. All of the state laws here say that compliance with state or federal regulations is a safe harbor from liability. Do FDA regs require you all to put that 100% claim on there? No, they do not, Your Honor. The federal register statement speaks to Kraft's product bearing the name 100% grated Parmesan cheese, but the standard of identity refers to grated Parmesan cheese. Does that mean that even if Kraft qualifies for the safe harbor, that wouldn't necessarily be a defense for all of the defendants? No, Your Honor. I think it would be a defense for all the defendants. In the safe harbor cases, the things that courts have relied on are pronouncements of regulators, not pronouncements of regulators in cases involving the very same party. If a regulation or a statement says it's the position of the FDA, in this case, that the following is permitted, that's a safe harbor for other defendants as well. They sold the same product. It was subject to the same regulations. They called it the same thing. Is it safe to say, Mr. Brody, that virtually all of this consumer protection law under state law is going to have to be decided by federal courts under the Class Action Fairness Act? No, Your Honor. I've seen some of these cases brought as individual cases. I've seen some of them brought as state-only claims, like a class of Illinois consumers or a class of California consumers, that sort of thing. I don't think, not necessarily. Congress, obviously, has decided to move a lot of litigation involving interstate commerce into the federal courts, and that's why we're here. But I don't think it would have to be that way. The plaintiff can, they may have a different opinion, but they could choose otherwise. Can I ask you about the preemption issue a little bit, Mr. Brody? Of course. The standard of identity does not necessarily address every aspect of a product. Suppose a manufacturer of grated Parmesan cheese put a false claim on the label that it was manufactured in Italy. Would a claim arguing that that's deceptive be preempted? No, Your Honor, it would not. Okay. And why not? Because the standard of identity and the FDA regulations indicate what should go on the label. It doesn't say anything about nationalism. Pardon me? So they're silent. I'm sorry. They are silent as to that. Yes, they are silent as to that. I think the next question would be, well, if they misstate something that is within the standard of identity, would there be a claim? And that issue arose in the Melendez cases, if I'm remembering correctly. And the court found the claim preempted because the claim was not asserted under how the FDA defines the term. But I think it allows room that if the party went beyond what the FDA defines as the product, there would be a claim. Mr. Brody, you're now into Mr. Collins' time. Thank you. I appreciate it. I just ask the court to affirm. Thank you. Mr. Collins? You're still muted, Mr. Collins. Mr. Collins, you're muted. There you go. The problem just came on. I'm sorry. May it please the court, Joe Collins on behalf of Appellees Publix, Target, and ICHO, and I'm here to address the timeliness of the notice of appeal with respect to the district complaints. One filed against Publix, which is document 226 in the district court record, and one filed against ICHO and Target, which is document 228 in the district court record. Under 28 U.S.C. 2107 and Appellate Rule 4a, a party must file a notice of appeal within 30 days of the entry of the order or judgment appealed from. Under Rule 4a.7, the date of entry is the earlier of the Rule 50a judgment or 150 days after a dispositive order is entered on the docket. There's no dispute here. The notice of appeal was filed more than 180 days after the November 1st order. The issue is whether the November 1st order constituted a final decision under 28 U.S.C. 1291. Under this court's decision in Paganis, a decision is final for purposes of 1291 if it ends the litigation on the merits and leaves nothing for the district court to do but execute the judgment. And the November 1st order did end the litigation on the merits with respect to those two discreet consolidated complaints, the one against Publix and the one against Target ICHO, and the only thing left to do was to enter to separate judgment. The order dismissed the two amended consolidated complaints in their entirety. All of the claims between the plaintiffs and the defendants named in those two standalone complaints were dismissed for failure to state a claim. And unlike the- Mr. Collins, in terms of the logic of the Gelboim case that dealt with multi-district litigation, just I want to make sure I understand your position is that the overall MDL was managed in such a way as to reorganize it into five discreet defendant-oriented operative complaints. Is that right? Correct. And under Gelboim, and these cases were consolidated for pretrial purposes only under the MDL. And under Gelboim- Five. Five separate ones. Yes. Yes. And under Gelboim, the dismissal of one of those complaints does not foreclose appeal where those complaints are consolidated for the purposes of pretrial only. So for that reason, two of those complaints being dismissed with prejudice, that appeal would be permissible. You wouldn't be required to wait for all five complaints to be resolved. And unlike the 2017 order, it did not state without prejudice. It did not expressly grant appellants leave to amend. The 2017 order did that. And under Rule 41B, unless stated to the contrary, a dismissal on the merits is a dismissal with prejudice. The November 1st order also stated that Publix and Target were dismissed from the litigation. And the separate admitted order entered on the same day said that the parties, Publix and Target were terminated as party defendants. So you have terminated as defendants, dismissed from the litigation. The order, in our view, smacks of finality. In terms of the separate document requirement, this court in Paganis recognized that admitted order may satisfy the separate document requirement. Here, the admitted order stated that Publix and Target echoes motions to dismiss were granted and terminated Publix and Target as party defendants. I note that in the Runyon case decided by this court, the phrase case terminated in a docket entry was sufficient under Rule 58 to constitute a separate judgment. In terms of waiver, I just wanted to touch briefly on that. If you find that the minute order was, in fact, a separate document for purposes of Rule 58, there is no waiver issue. It would be a jurisdictional issue under 2107, and the court would not be able to hear the appeal. If you decide that the minute order did not qualify as a separate judgment, we do not believe there was any waiver at the earliest. And since the court knew that there was a timeliness problem, it was raised in plaintiff's own docketing statement. It was raised when the court ordered us to address some of the jurisdictional issues. We cited the 2107 issue as well as the 150-day problem. And, in fact, the court's own order setting forth a briefing schedule asked us to address the timeliness issue. This is unlike Walker and Vergara, where after briefing, the court was finally alerted to the timeliness issue several months later and too late. Thank you, Mr. Cohn. Thank you. Ms. Hurd? Thank you. There's a critical misunderstanding here. The FDA standard of identity does not require that the anti-caking and fungicide go into grated cheese. It does not require. It is optional. And there's even one defendant in this case that doesn't add the fungicide ingredient. It is optional, which is exactly why the 100% labeling is important as a signal that, unlike some grated cheese, which does not have these additives, here they signal that their cheese is the same as grated cheese that does not have additives, and that's false. Second, another misconception is that plaintiffs in this case did not read the back of the label. They did not. That is not what they alleged. They read the front of the label. And a reasonable consumer, when the front label makes an affirmative misrepresentation, and here that's what we have, they say 100% cheese, that's false. A reasonable consumer is not required to investigate that further. They have a right to rely on advertisers' representations, and they don't have to flip to the back. And on the pleadings, the case is not dismissed. We go so that we can then develop the entire context with evidence and determine what a reasonable consumer would believe based on evidence. Three, there is state law does not follow this ambiguity rule that the district court and defendants keep talking about. State law is that if there's a representation on the front that is contradicted on the back, you go to the evidence. The cases that opposing counsel talked about where the court looks at the entire label is where the misrepresentation and the qualification are right next to each other. They're both on the front label. They're both on the front label, and that is not this case. Briefly on preemption, the district court didn't decide that in the first instance, and I think this court should not decide that in the first instance. The district court didn't rule on that at all, and if nothing else, the facts of what this letter from Kraft's attorneys mean or doesn't mean is a factual dispute that is relevant to preemption, and that should be determined first by the district court. And actually, on preemption, one case I would like the court to look at if you go to preemption is Levy-Conagra. That is a First Circuit Court of Appeal case where the court explained that the federal regulation has to be specific. There it had to do with disclosing GMO ingredients. The federal regulation said you don't have to disclose them, but that doesn't mean that you can affirmatively have a representation on the front of the label which represents that the ingredients are not there. So false advertising is different from a nondisclosure requirement. If you're going to have preemption, you need to have a specific federal regulation on whether this label is false or deceptive, and we don't have that in this case. On the timely appeal, the time to appeal in this case began to run in August of 2019, and here's why. The 2018 motion to dismiss decision was not a final decision on the merits that vesting the district court of jurisdiction. According to the Supreme Court, that's the Gelboim case, a final decision is when the district court disassociates itself from the case and all claims are resolved for all parties, and that's given a practical, not a technical construction. So here, first, the motion to dismiss was not a final decision because it was not specifically with prejudice. In spite of what defendants say, it was not specifically with prejudice. It was solid on that. Second, no judgment was entered. What do we make, though, of the language to the effect that these parties are terminated as party defendants? That sounds pretty final to me. That is a docket entry, but there was no judgment entered. A judgment requires a separate document signed by the clerk, and when the clerk wants to But under our precedent, a minute entry can count. But if you look at it, you look at the situation practically, what was the court doing? The court was overseeing an MDL litigation and managing all these cases. He did not step back and say, okay, I'm done with Publix and Target. He continued to manage them along with other cases. He set a briefing schedule on a motion for leave to amend. He then ruled on the leave to amend, and after ruling on the leave to amend, in the summer of 2019, that's when he stepped back and said, okay, I'm done with these cases now. What do I do about entering judgment? And he directed all the parties to say, what do I do about entering judgment? And all the parties, including Publix and Target, asked the district court to enter judgment in a particular way at that time, and that's when judgment was entered. But the 30 days is statutory and jurisdictional, as opposed to the 150. And so if what he did was reflect that he was done with the case, at least as to Target and Publix in November, then it really doesn't matter if Target and Publix conducted themselves like they were still in the litigation. They can't waive it. Well, but I don't think there's, but whether there's a final decision, you look at what the court, you do look at that in a practical way. That's what the Gelborn case says. You look at that in a practical way, and the court continued to manage, and you also look at what the court did. No judgment was entered separately by the clerk. Were there any distinctions between the 100% claims against Target and Publix and the 100% claims against the other defendants? No. I mean, no, not on the 100%, no. And I'm almost out of time, but I think that the waiver of the 150-day rule is important because Publix and Target told the court to enter judgment in a particular way in 2019. The court did exactly that. They never said, oh, don't enter judgment in 2019 because judgment was already entered months earlier. They only came up with that argument later. They've waived the 150-day rule. Thank you, Ms. Hirsh. Thank you very much. Thanks to all counsel. The case will be taken under advisement.